UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 20-19 |
| RANDY JONAL SCHENCK | SECTION M (5) |

## <u>ORDER & REASONS</u>

Before the Court is the request filed by the United States of America (the "Government") for an order of restitution to be imposed on the defendant in the amount of $1,099,408.67.[1] Defendant Randy Jonal Schenck opposes the full amount of the restitution requested by the Government,[2] and the parties submit supplemental memoranda addressing the proper amount to be awarded.[3]  Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons granting the request in part and denying it in part.

## I.     BACKGROUND

On October 6, 2022, this Court sentenced Schenck to 300 months' imprisonment[4] after he pleaded guilty to Counts 1 and 7 of the indictment pursuant to a Rule 11(c)(1)(B) plea agreement.[5] Those counts charged him with wire fraud, in violation of 18 U.S.C. § 1343, and interstate and foreign travel or transportation in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952. The charges stem from a wide-ranging theft and fraud scheme wherein Schenck and his accomplice, Dominique Berry,[6] conspired to target prospective male victims through the

---

[1] R. Doc. 170.
[2] R. Doc. 186.
[3] R. Docs. 192; 193; 194.
[4] R. Doc. 148.
[5] R. Docs. 119; 121; 147; 148.
[6] Berry was prosecuted by the Government as a co-conspirator in the scheme forming the basis of the wire fraud charge levied against Schenck.  *See United States v. Dominique Berry*, No. 19-cr-155 (E.D. La.), R. Docs. 1;

placement of online advertisements that suggested the availability of commercial sex acts. Once a prospective target agreed to meet with Berry, the pair would typically return to the victim's residence, where, under Schenck's direction, Berry would lace an alcoholic beverage with drugs supplied by Schenck to render the victim unconscious. Upon the victim's incapacitation, Schenck would direct Berry to steal valuables from the victim's residence, which typically included credit and debit cards, cash, laptops, and other electronics. Schenck and Berry would subsequently make unauthorized purchases with the stolen credit and debit cards and attempt to sell the other stolen valuables at pawn shops. Schenck and Berry executed this scheme "on at least fifty (50) occasions throughout the United States" from 2015 to 2017.[7] The pair were ultimately apprehended in Georgia in September 2017, but not before one victim was placed in the intensive care unit after reportedly suffering a "minor stroke," and another was found dead at his residence, following their interactions with Schenck and Berry.[8] In sentencing him to 300 months of imprisonment, the Court found Schenck to be the leader of the operation and concluded that he used threats and acts of physical violence to force Berry into continued participation in his prostitution trafficking scheme.

The only sentencing-related issue still pending before the Court is the amount of restitution Schenck should be ordered to pay to the victims of his offenses of conviction pursuant to the Mandatory Victims Restitution Act (the "MVRA"). On February 14, 2023, the Court held a restitution hearing, which involved the testimony of two witnesses and the admission of documentary evidence in further support of the Government's request, and heard oral argument.[9]

---

15; 25; 26. On December 5, 2019, Berry pleaded guilty to wire fraud and aggravated identity theft charges before another section of court for her role in the scheme. *Id.*, R. Doc. 24. On December 1, 2021, she was sentenced to 45 months of imprisonment. *Id.*, R. Doc. 98.

[7] R. Doc. 140 at 9.

[8] *Id.* at 10-11.

[9] R. Docs. 189; 190. The evidence adduced at the restitution hearing supplemented the facts already established in the factual basis supporting Schenck's guilty plea and in the presentence investigation report.

Following the hearing, the Court ordered the parties to submit supplemental memoranda to address the scope of the MVRA and issues related to certain of the categories of restitution sought by the Government.[10]

## II.   PENDING MOTION

The Government is requesting the Court to order Schenck to pay a total of $1,099,408.67 in restitution to the identified victims of the theft and fraud scheme he led and perpetrated.[11]   The Government's request consists of four categories of loss: (1) the value of the personal property items stolen from the individual victims of the theft and fraud scheme (totaling approximately $32,000); (2) the funeral expenses for S.A., the victim who was found dead after his interaction with Schenck and Berry ($12,885.84); (3) S.A.'s lost future wages ($1,000,000); and (4) the "gross income or value" received by Schenck "for Dominique Berry's commercial sex acts" between 2014 and 2017 ($54,000).[12]   The Government argues that an order requiring payment of restitution for each category of loss is compulsory under the MVRA and within the scope of the authority granted to the Court by the statute.   In supplemental briefing, the Government maintains its position that the amount and categories of restitution requested are appropriate under the MVRA and are supported by prevailing authorities.[13]

In opposition, Schenck concedes that he should be ordered to pay restitution for the value of the personal property he stole in the course of the scheme.   However, he contends that the bulk of the Government's request – more than $1 million of it – is both unprecedented and outside the permissible scope of restitution under the MVRA.[14]   Specifically, Schenck argues that the requests

---

[10] R. Doc. 189.
[11] R. Docs. 170 at 1; 192 at 14-15.
[12] R. Doc. 170 at 8-16.
[13] R. Doc. 192.
[14] R. Doc. 186 at 1, 6-7.

for approximately $12,000 in funeral expenses and $1,000,000 in lost future wages attributable to S.A. fall outside the scope of the MVRA and are unsupported by Fifth Circuit or other precedent. Similarly, Schenck argues that an award of $54,000 for the proceeds from the commercial sex acts rendered by Berry and confiscated by Schenck would be unprecedented when considering that he would be "ordered to pay restitution to a co-conspirator in the scheme to which he ple[aded] guilty."[15]  In supplemental briefing, Schenck reasserts his contention that the plain language of the MVRA – as well as Fifth Circuit precedent – precludes an award of funeral expenses and lost future wages in this context.[16]  He also maintains that there exists no authority to support an award of restitution to Berry for the proceeds from her commercial sex acts that Schenck seized during the course of the criminal enterprise.[17]

## III.   LAW & ANALYSIS

### A.  Standard for Ordering Restitution Under the MVRA

"'A federal court cannot order restitution except when authorized by statute.'"  *United States v. Espinoza*, 677 F.3d 730, 732 (5th Cir. 2012) (quoting *United States v. Love*, 431 F.3d 477, 479 (5th Cir. 2005)).  "The [MVRA] is one of several federal statutes that govern federal court orders requiring defendants convicted of certain crimes to pay their victims restitution." *Lagos v. United States*, 138 S. Ct. 1684, 1687 (2018).  The parties do not dispute that the MVRA authorizes the Court to order restitution to the victims of Schenck's offenses of conviction and, indeed, the Court has already found that the MVRA applies when it adopted the factual statements set out in the presentence investigation report ("PSR") as its findings of fact at sentencing.[18]  The MVRA mandates that the district court order a defendant to pay restitution to victims of offenses

---

[15] R. Doc. 186 at 9.
[16] R. Doc. 193 at 3-7.
[17] *Id.* at 1-3.
[18] *See* R. Docs. 149 at 1; 162 at 100-01.

against property under Title 18 and of crimes of violence, among other offenses.  *Id.* (citing 18 U.S.C. § 3663A(c)(1)(A)).  For offenses that fall within the MVRA, restitution is required when "an identifiable victim suffers a physical or pecuniary loss."  *United States v. Koutsostamatis*, 956 F.3d 301, 304 (5th Cir. 2020) (citing 18 U.S.C. § 3663A(c)(1)(B)).  In the event the victim is deceased, the MVRA expressly provides for the payment of restitution to the victim's estate.  18 U.S.C. § 3663A(a)(1).  A "victim" under the MVRA is defined as:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id.* § 3663A(a)(2).  The Fifth Circuit has described the district court's authority to award restitution under the MVRA as follows:

> The MVRA limits restitution to the actual loss directly and proximately caused by the defendant's offense of conviction.  An award of restitution cannot compensate a victim for losses caused by conduct not charged in the indictment or specified in a guilty plea, or for losses caused by conduct that falls outside the temporal scope of the acts of conviction.  Moreover, excessive restitution awards cannot be excused by harmless error; every dollar must be supported by record evidence.

*United States v. Sharma*, 704 F.3d 318, 323 (5th Cir. 2012) (footnotes omitted).  And while "[a] defendant sentenced under the MVRA is only responsible to pay restitution for the conduct underlying the offense for which he has been convicted," when "a fraudulent scheme is an element of the conviction, the court may award restitution for actions pursuant to that scheme."  *United States v. Adams*, 363 F.3d 363, 366 (5th Cir. 2004) (quoting *United States v. Cothran*, 302 F.3d 279, 289 (5th Cir. 2002)); *see also Hughey v. United States*, 495 U.S. 411, 420 (1990) (holding in regard to a predecessor to the MVRA "that the loss caused by the conduct underlying the offense

of conviction establishes the outer limits of a restitution order").[19]  "Both the statutory language of the MVRA and [the Fifth Circuit's] prior decisions make it plain that a defendant's conviction on one count can support a broad restitution award encompassing additional losses *only* if the count of conviction requires proof of a scheme, conspiracy, or pattern of criminal activity as an element." *Maturin*, 488 F.3d at 661-62 (emphasis in original).

The MVRA delineates the types of loss a defendant is required to pay a victim in restitution. If the offense of conviction results in the victim having (1) lost property, then the property must be returned or the defendant must pay an amount equal to its value; (2) suffered bodily injury, then the defendant must pay for the costs associated with the injury, including medical expenses, rehabilitation expenses, and lost income; (3) suffered death, then the defendant must pay for the cost of funeral expenses; and (4) participated in the investigation or prosecution of the offense, then the defendant must reimburse certain expenses incurred during such participation. *See Lagos*, 138 S. Ct. at 1687-88 (citing 18 U.S.C. § 3663A(b)(1)-(4)).

The Government bears the burden of establishing the proper restitution amount by a preponderance of the evidence when the amount is in dispute. *See* 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.  The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."); *United States v. Frazier*, 577 F. App'x 271, 273 (5th Cir. 2014).  Each category of loss for restitution must be supported by record evidence. *See United States v. Beacham*, 774 F.3d 267, 279 (5th Cir. 2014). A court is required "to order restitution to each victim in the full amount of each victim's losses

---

[19] The Fifth Circuit has observed that although "the *Hughey* court was interpreting the Victim and Witness Protection Act, 18 U.S.C. § 3663, *Hughey*'s reasoning 'also applies to cases arising under the MVRA.'" *United States v. Mathew*, 916 F.3d 510, 516 n.1 (5th Cir. 2019) (quoting *United States v. Maturin*, 488 F.3d 657, 661 n.2 (5th Cir. 2007)).

as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).

### B. Analysis

#### 1. The value of personal property stolen from individual victims

The Government and Schenck agree that the MVRA functions to require an order directing Schenck to pay restitution to those victims from whom Schenck stole personal property. The parties only disagree as to the amount owed to victim T.K. in light of a Georgia state-court's judgment of restitution in the amount of $100 against Schenck for the same theft to which he pleaded guilty here. Schenck contends that satisfaction of the $100 state-court restitution order[20] should satisfy the full amount of the loss claimed by the Government as to T.K. – $1,588.97.[21] The Government maintains its position that Schenck is responsible for the full amount of T.K.'s loss, notwithstanding the state-court order. Given the evidence in the record, the Court will reduce Schenck's restitution obligation to T.K. by $100 to account for the amount imposed by the state-court judgment. Otherwise, the Court accepts and adopts the total amount in restitution owed to the individual victims of the theft and fraud scheme as outlined in the PSR and further supported by the evidence submitted by the Government on behalf of the victims.[22] Pursuant to the record evidence, Schenck owes restitution for the value of the stolen personal property to the individual victims as follows:

- Victim M.Y.: $512.00

- Victim K.B.: $6,650.00

- Victim C.H.: $4,200.00

---

[20] R. Doc. 186-1 at 2.
[21] Schenck's counsel offered this argument at the restitution hearing.
[22] R. Docs. 140 at 9-16; 170 at 9 (citing R. Docs. 170-4 through -7).

- Victim J.S.: $3,181.00

- Victim JP Morgan Chase Bank, N.A.: $152.20

- Victim J.T.: $720.00

- Victim A.M.: $1,825.00

- Victim T.K.: $1,488.97

- Victim W.T.: $4,288.59

- Victim R.M.: $2,410.00

- Victim C.H. #2: $4,016.51

- Victim A.E.: $3,200.00

- Victim S.A. #2: $100.00

- S.A.'s estate: $3,679.56

**2. S.A.'s lost future income and funeral expenses**

The Government asks the Court to order Schenck to pay approximately $1 million in lost future income and $12,885.84 in funeral expenses to S.A.'s estate. In making the request, the Government argues that the plain language of the MVRA authorizes an award of lost future income and funeral expenses and indeed mandates such an award because it has established that Schenck's conduct underlying the relevant offense of conviction – here, wire fraud – was a direct and proximate cause of S.A.'s death. The Government asserts that, of the circuits that have considered whether the MVRA authorizes a court to award lost future income, all have concluded that it does.

Schenck counters, arguing that the plain language of the MVRA does not authorize the award of lost future income in all instances when an offense results in the death of a victim. He asserts that the cases the Government cites in support of awarding lost future income all involved a homicide conviction and, because Schenck's relevant offense of conviction is wire fraud, an

order directing restitution for lost future income in these circumstances would be unprecedented and not authorized by the MVRA.

Here, the Government is seeking an order directing Schenck to pay restitution in the amount of lost future income to the estate of S.A., one of the victims of the theft and fraud scheme. Because "[t]he MVRA limits restitution to the actual loss directly and proximately caused by the defendant's offense of conviction," the Court must look to the counts to which Schenck pleaded guilty in determining whether lost future income and funeral expenses are appropriate for an award of restitution under the MVRA. *Sharma*, 704 F.3d at 323. Count 1 is inapplicable, as it involves Schenck's use of a facility of interstate commerce (the internet) to facilitate the prostitution enterprise in Arizona.[23] The specific conduct underlying Count 1 is thus wholly unrelated to S.A. Count 7, however, charges Schenck with wire fraud, and the conduct underlying that charge relates specifically to Schenck's scheme to surreptitiously drug S.A., steal his valuables, and use his debit card without his authorization.[24] Therefore, the Court will examine Schenck's wire fraud to determine whether and the extent to which restitution is owed to S.A.'s estate under the provisions of the MVRA.

### a. Whether wire fraud is an applicable offense of conviction

The MVRA states that a court "shall order" restitution to the victim or the victim's estate "when sentencing a defendant convicted of an offense described in subsection (c)." 18 U.S.C. § 3663A(a)(1). Subsection (c) includes "an offense against property under [Title 18] ... including any offense committed by fraud or deceit." *Id.* § 3663A(c)(1)(A)(ii). The Fifth Circuit has concluded that wire fraud, in violation of 18 U.S.C. § 1343, is an offense covered by the MVRA. *See United States v. Williams*, 993 F.3d 976, 980 (5th Cir. 2021) ("The [MVRA] mandates

---

[23] R. Doc. 27 at 5.
[24] *Id.* at 6-8.

restitution to victims of offenses under Title 18 that are 'committed by fraud or deceit.'  That obviously includes wire fraud.") (quoting 18 U.S.C. § 3663A(c)(1)(A)(ii)) (internal citations omitted).

"The elements of wire fraud are: '(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud.'" *United States v. Comstock*, 974 F.3d 551, 557 (5th Cir. 2020) (quoting *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018)).  To be sure, in the context of restitution under the MVRA, the Fifth Circuit has specifically observed that "a scheme to defraud is an element" of the offense of wire fraud in violation of 18 U.S.C. § 1343.  *United States v. Gassaway*, 856 F. App'x 504, 507 (5th Cir. 2021) (citing *Beacham*, 774 F.3d at 271, 278-80, and *United States v. Inman*, 411 F.3d 591, 593, 595 (5th Cir. 2005)).  Therefore, when evaluating whether S.A.'s estate is owed restitution for his lost future income and funeral expenses under the MVRA, the Court may properly consider Schenck's acts in furtherance of his scheme to defraud S.A.[25]  As such, Schenk's contention that restitution should be limited to losses stemming from the wire fraud itself, without examining the entirety of the scheme, is not apt.[26]  After all, § 3663A(c)(1)(B) contemplates that the identifiable victim of an offense – whether a crime of violence or an offense against property like a scheme to defraud – may suffer "a physical injury or pecuniary loss" for which restitution is to be awarded.

---

[25] Schenck's administration of the scheme as regards S.A. is clearly within the temporal scope of the relevant offense of conviction.  *Adams*, 363 F.3d at 366.  Count 7 of the indictment, to which Schenck pleaded guilty pursuant to a plea agreement, R. Doc. 121, is based on his actions in furtherance of the fraudulent scheme he devised and directed *as specifically applied to S.A.*  The indictment and factual basis both state that Schenck brought Berry to S.A.'s home, he instructed Berry to drug S.A., and once S.A. was incapacitated, he stole or instructed Berry to steal from S.A.  R. Docs. 27 at 6-8; 120 at 4-5.

[26] R. Doc. 186 at 10-14.

### b.  Whether S.A. qualifies as a victim under the MVRA

Having determined that wire fraud is an offense covered by the MVRA, the Court now looks to whether S.A. qualifies as a victim under the statute.  S.A. must have been "directly and proximately harmed as a result of [Schenck's] commission of [wire fraud]" in order to qualify as a victim under the statute.  18 U.S.C. § 3663A(a)(2).  And while "[t]he MVRA limits restitution to the actual loss directly and proximately caused by the defendant's offense of conviction," *Sharma*, 704 F.3d at 323, the wire fraud conviction here "can support a broad restitution award encompassing additional losses" because wire fraud includes "'as an element a scheme, conspiracy, or pattern of criminal activity.'"  *Maturin*, 488 F.3d at 662; *see Adams*, 363 F.3d at 366 (holding that when "a fraudulent scheme is an element of the conviction, the court may award restitution for actions pursuant to that scheme") (quotation omitted).  Thus, the Court must examine whether Schenck's acts in furtherance of his scheme to defraud S.A. were the direct (*i.e.*, but-for) and proximate cause of S.A.'s death.

"[B]ut-for causation is 'not a difficult burden to meet,' and there can be 'many but-for causes.'"  *United States v. Mun*, 837 F. App'x 293, 295 (5th Cir. 2020) (quoting *United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019)).  The inquiry here is whether the harm to S.A. (his death) would have occurred in the absence of Schenck's conduct.  In *Mun*, the Fifth Circuit concluded that the charged conduct of the defendant, who pleaded guilty to maintaining a drug-involved premises in violation of 21 U.S.C. § 856, was a but-for cause of the deaths of two victims who either overdosed or were beaten to death by a drug dealer at the hotel the defendant was operating.  837 F. App'x at 295-96.  The defendant "maintained an unsafe environment replete with drug deals, overdoses, and instances of violence and torture," and took measures to prevent the intervention of police and to facilitate the proliferation of illicit drug use and distribution. *Id.*

The court reasoned that, but for the defendant's maintenance of the hotel in such a manner, the victims would not have died.  *Id.* at 296.

The evidence before the Court makes clear that Schenck's conduct in committing wire fraud was a but-for cause of S.A.'s death.  Schenck admitted, when agreeing to the factual basis, that Berry, "[a]cting at Schenck's direction, while at S.A.'s apartment, ... provided S.A. various substances, mixed within alcohol without his knowledge, to loosen S.A.'s inhibitions and to render him more susceptible to theft."[27]  According to the PSR, "Schenck would give Berry illegal drugs and prescription medication with neuro-suppressive side effects .... and directed her to place the drugs surreptitiously into the prostitution date's alcoholic beverage," and he "obtained the drugs from multiple sources, including relatives and prior victims."[28]  Further, the report indicates that Schenck brought Berry to S.A.'s residence on February 24, 2017, where the scheme unfolded as follows:

> Acting in accordance with Schenck's instructions, Berry placed drugs designed to incapacitate S.A., including multiple anti-psychotic medications, into S.A.'s beverage without S.A.'s knowledge or authorization. After S.A. lost consciousness, Berry contacted Schenck by text message and told him S.A. was incapacitated. Schenck returned to S.A.'s apartment, where over the next several hours he and one or more additional co-conspirators stole numerous items belonging to S.A., including S.A.'s wallet, two cellular phones, keys, a debit card in S.A.'s name, and [a] 2012 Toyota Tacoma truck.[29]

The very next day, on February 25, 2017, law enforcement officers discovered S.A.'s body while conducting a wellness check at his home.[30]  At the restitution hearing, the Court received into evidence S.A.'s amended autopsy report.[31]  The report states that S.A. "died as a result of combined

---

[27] R. Doc. 120 at 5.
[28] R. Doc. 140 at 8.
[29] *Id.* at 11.
[30] *Id.*; *see also* R. Doc. 186-3 at 5.
[31] R. Docs. 190; 170-2.

toxic effects of ethanol, olanzapine, quetiapine, and hydroxyzine."[32]  Additionally, the Court heard from Dr. Gerald Cvitanovich, the Jefferson Parish coroner, who testified that it was his opinion, as expressed in the amended autopsy report, that alcohol consumption, in combination with the effects of olanzapine, quetiapine, and hydroxyzine, caused S.A.'s death.[33]  Clearly, then, but for Schenck's facilitation of the meeting between Berry and S.A., his provision of drugs to render S.A. incapacitated, and his direction to spike S.A.'s beverage with the drugs, S.A. would still be alive.  *See Mun*, 837 F. App'x at 295.  And the Court expressly so finds.

Having found that Schenck's actions in furtherance of his wire fraud scheme were a but-for cause of S.A.'s death, the Court now turns to evaluating whether his actions were a proximate cause.  "[A] person is 'proximately harmed' when the harm is 'a reasonably foreseeable consequence of the criminal conduct.'"  *Id.* at 296 (quoting *Mathew*, 916 F.3d at 519).  In *Mun*, the Fifth Circuit concluded that the defendant's operation of the drug hotel proximately caused the death of the two victims because it was reasonably foreseeable that a fatal overdose or violent encounter would happen in the hotel, an "addict's paradise," where "[drug] dealers were incentivized not to call 911."  *Id.*  Here, the record evidence clearly demonstrates that Schenck obtained illicit or prescription drugs for the purpose of incapacitating individuals targeted for theft and fraud, including S.A.  It shows that Schenck provided Berry with the drugs and instructed her to place them in the victims' alcoholic beverages to facilitate the ease with which the pair could subsequently rob them.  There is no evidence indicating that Schenck or Berry knew these victims or had any understanding about their health, medical needs, drug usage, or potential physiological response or susceptibility to a drug-alcohol cocktail.  It is therefore reasonably foreseeable that a stranger like S.A. may well die after unknowingly ingesting a combination of drugs (*viz.*,

---

[32] R. Doc. 170-2 at 2.
[33] R. Doc. 191 at 12, 20, 27-28, 31-32.

olanzapine, quetiapine, and hydroxyzine) that had been mixed into an alcoholic beverage.  *See, e.g.*, *United States v. Spinney*, 795 F.2d 1410, 1415-16 (9th Cir. 1986) (holding that proximate cause for purposes of restitution was established where it was entirely foreseeable that the circumstances created by the charged conspiracy, which involved threatening to kill a victim who was "wasted" by having ingested drugs and alcohol, could result in the victim's death).  Consequently, the Court also finds that the conduct underlying Schenck's conviction for wire fraud proximately caused S.A.'s death.

In sum, the Court's evaluation of Schenck's conduct in furtherance of his scheme to defraud S.A. makes clear that Schenck's offense of conviction – here, wire fraud – was the direct and proximate cause of S.A.'s death.  Therefore, S.A. qualifies as a victim to whom Schenck must pay restitution under the MVRA.  The next task, then, is to determine the categories of restitution that S.A.'s estate is owed under the MVRA.

### c.  The recoverable losses owed to S.A.'s estate

The Government argues that the MVRA requires Schenck to pay to S.A.'s estate an amount in restitution reflecting S.A.'s lost future wages and the cost of his funeral expenses.  Schenck responds that the plain language of the statute precludes an award of lost future income because funeral expenses are the only type of restitution listed in the MVRA for an offense resulting in the death of a victim.  In making this argument, Schenck asks the Court to read the provisions on recoverable loss – 18 U.S.C. § 3663A(b) – in the disjunctive.  Next, Schenck maintains that for the Court to award lost future income, it would be required to resolve complex and disputed factual issues which the Court should abstain from doing under § 3663A(c)(3)(B).[34]  Finally, Schenck argues that even if the Court decides to resolve the factual issues, an award of lost future income

---

[34] R. Doc. 186 at 10-14.

would be inappropriate because the offense of conviction is not a homicide or other crime of violence.[35]  The Court will take these arguments in turn.

The Court first examines the plain language of the statute to determine whether the MVRA authorizes an award of lost future income to S.A.'s estate.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-76 (2009) ("'Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'") (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)); *United States v. Lauderdale Cnty.*, 914 F.3d 960, 964 (5th Cir. 2019) ("The task of statutory interpretation begins and, if possible, ends with the language of the statute.") (quotation omitted).  "'When the language is plain, we must enforce the statute's plain meaning, unless absurd.'"  *Lauderdale Cnty.*, 914 F.3d at 964 (quoting *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013)).  The MVRA specifies four different categories of recoverable loss the recovery of which depends on the nature of the offense:

(b) The order of restitution shall require that such defendant –

(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense –
(A) return the property to the owner of the property or someone designated by the owner; or
(B) if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to –
(i) the greater of –
(I) the value of the property on the date of the damage, loss, or destruction; or
(II) the value of the property on the date of sentencing, less
(ii) the value (as of the date the property is returned) of any part of the property that is returned;

(2) in the case of an offense resulting in bodily injury to a victim –
(A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in

---

[35] R. Docs. 186 at 15-16; 193 at 4-6; 194 at 1-2.

accordance with a method of healing recognized by the law of the place of treatment;

(B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

(C) reimburse the victim for income lost by such victim as a result of such offense;

(3) in the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; *and*

(4) in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

18 U.S.C. § 3663A(b)(1)-(4) (emphasis added).  Schenck contends that, when an offense results in bodily injury that results in death as contemplated by § 3663A(b)(3), restitution for offenses where bodily injury results, § 3663A(b)(2), does not apply.  In making this argument, he invites the Court to read the provisions detailing the categories of recoverable loss in the disjunctive.  But the plain text of the statute belies this suggested interpretation.

First, § 3663A(b) is written in the conjunctive.  The categories of recoverable loss under subsection (b) are connected by the word "and," which undermines entirely the view that the categories of loss are meant to be read in the disjunctive, essentially as alternatives, rather than potentially cumulative.  Second, the plain language of § 3663A(b)(2)(C) contemplates an award of lost income as restitution to any victim of an offense resulting in bodily harm regardless of whether death also resulted.  Subsection (b)(2)(C) provides that "[t]he order of restitution shall require that such defendant in the case of an offense resulting in bodily injury to a victim reimburse the victim for income lost by such victim as a result of such offense."  It cannot reasonably be suggested that a victim who died as a result of the offense of conviction did not also suffer bodily injury.  Such a conclusion would lead to the absurd result that a defendant convicted of an offense resulting in the death of a qualifying victim would only be ordered to pay the cost of funeral

expenses, whereas a victim who survived could recover the "income lost *as a result of the offense*," even when the offense was the same.  *See United States v. Cienfuegos*, 462 F.3d 1160, 1164 (9th Cir. 2006) (observing that "[i]t would be illogical to assume that the ultimate death of a person who suffered bodily injury eliminates restitution for lost income").  Third, the MVRA makes provision for the payment of restitution to a deceased victim's estate, which further supports the conclusion that the statute envisions the possibility of restitution for each applicable category of recoverable loss when a victim has died.  18 U.S.C. § 3663A(a)(1)-(2).

While the Fifth Circuit has not been called upon to address whether the loss categories under the MVRA should be read in the disjunctive, other circuits, when faced with this argument, have expressly rejected such a reading.  *See United States v. Messina*, 806 F.3d 55, 67-68 (2d Cir. 2015) (emphasizing conjunctive and overlapping nature of the loss provisions to "conclude that the language of 18 U.S.C. § 3663A(b)(2)(C) [the lost income provision] authorizes restitution to all victims of qualifying offenses resulting in bodily injury, both those who survive those injuries and those who die therefrom"); *United States v. Serawop*, 505 F.3d 1112, 1119-20 (10th Cir. 2007) (rejecting the defendant's invitation to read the MVRA in the disjunctive and concluding that lost income is recoverable even when the victim dies as a result of the offense); *Cienfuegos*, 462 F.3d at 1163-69 (holding that the plain language of the MVRA contemplates "and certainly does not expressly exclude" a restitution award to a deceased victim's estate for income lost as a result of her involuntary manslaughter); *United States v. Oslund*, 453 F.3d 1048, 1063 (8th Cir. 2006) (reading the loss provisions in the conjunctive to observe that the MVRA "plainly states that a victim can recover income that is lost due to a crime causing bodily injury, *and* if that victim dies, then the estate can recover in the victim's place") (emphasis added).  This Court agrees with these circuit courts that the loss provisions of the MVRA are to be read in the conjunctive and thus

authorize courts to award restitution for lost income not only when the offense results in bodily injury alone but also when the offense results in both bodily injury and the victim's death.

Yet, Schenck argues that an award of *future* lost income – that is, the kind of lost income necessarily in view when the victim has died – exceeds the scope of statutory authority permitted by the MVRA. Construing the provisions of § 3663A(b) in the conjunctive, the four circuits that have confronted the question all have concluded that the MVRA authorizes an award of lost future income for an offense that results in bodily injury and death to a victim. *See Messina*, 806 F.3d at 67 (holding that "the MVRA's lost income provision applies to future income lost as a result of the offense of conviction" where the offense resulted in bodily injury and death to the victim); *Cienfuegos*, 462 F.3d at 1164 (holding that "it is plain that the statute allows a representative of the victim's estate or another family member to assume the victim's rights to collect restitution for future lost income"); *Oslund*, 453 F.3d at 1063 (observing that "[b]ecause future income is income that is lost to the victim as a direct result of the crime, the plain language of the statute leads to the conclusion that lost future income can be included in a restitution order" for an offense resulting in both bodily injury and death to the victim); *Serawop*, 505 F.3d at 1122 (stating that "our reading is consistent with the Eighth Circuit's view that the plain language [of the MVRA] suggests lost income encompasses both incurred and future lost income" for the victim of an offense resulting in bodily injury and death) (citing *Oslund*, 453 F.3d at 1063).[36] Again, nothing in the language of

---

[36] While the Fifth Circuit has not directly weighed in on the issue, in *United States v. Razo-Leora*, 961 F.2d 1140, 1146 (5th Cir. 1992), the court affirmed an award of restitution which included lost future income under a predecessor statute to the MVRA. The precise issue *sub judice* was not before the *Razo-Leora* court, however, as the dispute between the defendant and the government appears to have involved only the adequacy of the evidence supporting the quantum of the award itself. *Id.* Still, the Court notes that the Fifth Circuit has cited with approval the decisions of its sister circuits in *Messina*, *Cienfuegos*, *Oslund*, and *Serawop*, which concluded that lost future income is recoverable under the MVRA, when it affirmed a district court's order of restitution under the statute for payment of future medical expenses. *United States v. Serrata*, 679 F. App'x 337, 340 (5th Cir. 2017). Moreover, in *United States v. Poole*, 2012 WL 4863789, at *4 (E.D. La. Oct. 11, 2012), another section of this court ordered the defendant to pay restitution in the amount of the deceased victim's lost future wages under the MVRA.

the statute expressly precludes an award of lost future income to a victim who has died as a result of the bodily injury he or she sustained.  While the MVRA does not define the term "income lost," a "'fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'"  *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 242 (5th Cir. 2022) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  The ordinary meaning of "lost income" (or "lost earnings") includes lost future income.  *See* BLACK'S LAW DICTIONARY 621 (10th ed. 2014) (defining "lost earnings" as "[w]ages, salary, or other income that a person could have earned if he or she had not lost a job, suffered a disabling injury, or died").  This conclusion is in accord with the decisions of the four circuit courts that have interpreted the MVRA in a similar context.  *See, e.g.*, *Messina*, 806 F.3d at 68-69.  Therefore, the phrase "income lost" in § 3663A(b)(2)(C) allows for an award of lost future income as restitution for a victim who has died as a result of bodily injury the defendant's actions caused.

Schenck next argues that the complexity of resolving the cause of S.A.'s death and the extent of his losses preempt application of the MVRA under § 3663A(c)(3)(B).[37]  He maintains that the cause of S.A.'s death, as well as the proper amount of his lost future income, remain "heavily disputed."[38]  Therefore, says Schenck, under the plain language of the MVRA, its provisions "shall not apply."[39]  Section 3663A(c)(3)(B) states:

> This section shall not apply in the case of an offense [against property] if the court finds, from the facts on the record, that determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

---

[37] R. Doc. 186 at 10-14.
[38] *Id.* at 11.
[39] *Id.* at 10 (quoting 18 U.S.C. § 3663A(c)(3)(B)) (emphasis omitted).

This language, however, merely provides the Court with the discretion to "find[], from facts on the record," that a resolution of factual issues may be so complex as to make an order of restitution under the MVRA inadvisable.  But the Court's review of the factual issues and the record in this case shows that such a conclusion is not warranted here.  To the contrary, in a relatively short and straightforward restitution hearing, the Court received evidence to establish facts supplementing those already established by the factual basis and presentence investigation report.  Together, this evidence demonstrates that Schenck orchestrated and facilitated Berry's meeting with S.A.; that Schenck procured various prescription and illicit drugs, supplied them to Berry, and then ordered her to surreptitiously administer them to unsuspecting victims; that Schenck, following Berry's signal that S.A. was incapacitated, entered S.A.'s home to steal his valuables, including the debit card that Schenck used without S.A.'s authorization; that on the day after S.A.'s encounter with Schenck and Berry, police found S.A.'s lifeless body at his home; and that, as the Jefferson Parish coroner testified and other records substantiated, the drugs found in S.A.'s system, in combination with the alcohol, caused his death.

In determining that Schenck's actions in furtherance of his scheme to defraud S.A. were the cause of S.A.'s death for purposes of fixing a restitution award under the MVRA, the Court was not required to find proof beyond a reasonable doubt.  The Government's burden was to demonstrate by a preponderance of the evidence that Schenck's conduct was a but-for and proximate cause of S.A.'s death.  And the Government satisfied this burden.  Further, as discussed below, the Government also carried its burden of proving the amount of income S.A. lost as a result of Schenck's offense.  Where the relevant facts have been established, it cannot be said that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any

victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).

Accordingly, the Court declines to invoke what is known as the "complication" exception of §

3663A(c)(3)(B) to forego an order of restitution to S.A. for his lost future wages and funeral

expenses.[40]

Schenck argues further that, if the Court decides to resolve the factual issues related to the

cause of S.A.'s death, an award of lost future income in the context of a wire fraud conviction

would be "unprecedented" and outside the scope of the authority of the MVRA.[41]  Schenck reasons

that an award of lost income is subject to a "different analysis than the other provisions" regarding

the types of recoverable loss because Congress included language requiring the lost income to

"relate back" to the elements of the offense of conviction – here, the wire fraud.[42]  Schenck

contends that the Government has not made such a showing.[43]  This argument fails for at least two

reasons.

First, as established above, because a scheme is an element of wire fraud, and the Court

has found that S.A.'s death was caused by Schenck's conduct in advancing the scheme, S.A.'s lost

income does indeed relate to the offense of conviction in the very manner the MVRA envisions.

"[T]he MVRA describes the available restitution based on the type of *damage or loss* suffered by

the victim rather than the type of *offense*."  *Mun*, 837 F. App'x at 295 (emphasis added).  Schenck's

interpretation ignores the scope of recoverable harm authorized by the MVRA "in the case of an

---

[40] Moreover, one treatise has observed: "[T]he 'complication' exception does not apply to violent offenses. Presumably an offense that results in a victim's death, for which determining the victim's future lost income might be relevant, would be considered violent.  The case law confirms this proposition."  CATHARINE M. GOODWIN, FEDERAL CRIMINAL RESTITUTION § 7:31, at 397 (2022).  If this observation is a correct statement of the law, then this Court was not free in any event to invoke the "complication" exception since Schenck's offense, regardless of its classification, resulted in S.A.'s death and would be considered violent.

[41] R. Docs. 186 at 10; 193 at 4-6; 194 at 1-2.

[42] R. Doc. 193 at 4-5.  Notably, Schenck cites to no authority to support his conclusion that § 3663A(b)(2)(C) requires the relation back of a victim's lost income to the elements of the offense of conviction itself.

[43] *Id.* at 4.

offense that involves as an element a scheme, conspiracy, or pattern of criminal activity."  18 U.S.C. § 3663A(a)(2).  "The MVRA broadly defines 'victim' to include not only losses directly caused by the behavior underlying the convicted offense, but also losses arising more generally as a result of a conspiracy, scheme, or pattern of criminal activity" when the offense of conviction includes a conspiracy, scheme, or pattern as an element.  *United States v. Benns*, 810 F.3d 327, 329 (5th Cir. 2016).  Schenck's argument that the lost income must "relate back" to the conduct strictly underlying the wire fraud conviction – in his view, his possession and unauthorized use of S.A.'s debit card – is too narrow a focus, running contrary to the broad view adopted in *Benns*, for it ignores the acts Schenck committed in furtherance of his scheme to defraud S.A.

Second, Schenck's position is not supported by the language of the statute, which provides in relevant part that:

> (b) The order of restitution shall require that such defendant –
> ….
>    (2) in the case of an offense resulting in bodily injury to a victim –
>    (A) pay an amount equal to the cost of *necessary* medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
>    (B) pay an amount equal to the cost of *necessary* physical and occupational therapy and rehabilitation; and
>    (C) reimburse the victim for income lost by such victim *as a result of such offense* ....

18 U.S.C. § 3663A(b)(2)(A)-(C) (emphasis added).  Although Schenck is correct that the provisions on medical and rehabilitation expenses do not include the phrase "as a result of such offense," these two provisions restrict any award to "necessary" costs, meaning costs the victim necessarily incurred as a result of the offense.  The phrase "as a result of such offense" in the lost income provision constitutes a similar restriction, limiting any restitution award to income lost by such victim "as a result of [an] offense" causing bodily injury.  Without the phrase "as a result of

the offense," the provision would read "reimburse the victim for income lost by such victim," containing no contextual limitation, and could be understood to authorize an award for income lost as a result of events wholly unrelated to a defendant's offense of conviction, or in the case of an offense involving a scheme, unrelated to the defendant's actions in furtherance of the scheme. Therefore, the phrase in subsection (C) functions to limit the scope of any award for lost income to income lost because of the offense of conviction (including, where applicable, a scheme), just as subsections (A) and (B) limit recovery to those expenses made "necessary" by the offense resulting in bodily injury. The phrase "as a result of such offense" simply does not impose the narrower restriction Schenck suggests.

Finally, Schenck asserts that an award of lost future income to S.A.'s estate is inappropriate because his offense of conviction did not involve a homicide. In support, Schenck points to the Government's failure to identify a case where lost future income was awarded under the MVRA for a non-homicide-related offense. The Court acknowledges that most of the cases relied upon by the Government in support of its request for S.A.'s lost future income involve convictions for a homicide offense. *See, e.g.*, *Cienfuegos*, 462 F.3d at 1161, 1163-64 (holding that the MVRA authorizes restitution for lost future income where the defendant was convicted of voluntary manslaughter); *Serawop*, 505 F.3d at 1114, 1122 (same); *Oslund*, 453 F.3d at 1051-52, 1062-63 (upholding restitution for lost income where the defendant was convicted of murder). But nor does Schenck cite to authority for the proposition that lost future income under the MVRA is limited exclusively to convictions for homicide offenses. Indeed, the Second Circuit in *Messina* affirmed the district court's order directing the defendant to pay restitution in the amount of the deceased victim's lost future income where the defendant was convicted "of one count of racketeering conspiracy." 806 F.3d at 58. The defendant Neil Messina "admitted," as a "charged predicate

23

act[],￼" to having been involved in a conspiracy to rob Joseph Pistone, Sr., that resulted in Pistone's death.  *Id.*  During the robbery, one of Messina's co-conspirators shot and killed Pistone.  Although Messina was neither charged with nor pleaded guilty to a homicide offense, his offense of conviction necessarily involved as an element a conspiracy wherein acts in furtherance of that conspiracy resulted in the death of Pistone.  *Id.* at 70-71 (holding that "we identify no error in the district court's award to Pistone's family of income lost to the victim as a result of the robbery conspiracy offense that took his life").  The *Messina* court reasoned that "the lost-income provision of the MVRA, 18 U.S.C. § 3663A(b)(2)(C), ... appl[ies] to any victim of an offense resulting in bodily injury, whether the victim survives the injury or dies therefrom."  *Id.* at 70.

Similarly, Schenck's offense of conviction includes as an element a scheme to defraud that ultimately resulted in the bodily injury and death of one of the intended victims, S.A.  As in *Messina*, where the court considered Messina's acts in furtherance of the conspiracy to rob Pistone, this Court likewise takes into account Schenck's acts in furtherance of his scheme to defraud S.A. in assessing whether lost income should be awarded.  To steal from S.A., Schenck ordered Berry to surreptitiously drug him with substances that Schenck himself provided.  Following S.A.'s incapacitation, Schenck entered S.A.'s home to rob him of several items, including the debit card Schenck would go on to use without S.A.'s authorization.  The unauthorized use of that debit card is the specific conduct that underpins Schenck's conviction for wire fraud, but the Court must also consider the whole of the *scheme* Schenck employed to gain possession of the debit card in the first place.  In the course of that scheme, S.A. was drugged at Schenck's direction, and the following day, his dead body was discovered by the authorities.  Therefore, although Schenck was never charged with or convicted of S.A.'s homicide, his actions in furtherance of the wire fraud scheme still support a finding that those actions were the direct and proximate cause of S.A.'s

death.  Again, as in *Messina*, where the defendant was not charged with or convicted of Pistone's homicide, his actions and the actions of his co-conspirators in furtherance of the robbery conspiracy were considered by the Second Circuit in affirming the district court's conclusion that the co-conspirators' actions were the direct and proximate cause of Pistone's death, *id.* at 70-71, and that, even though the defendant's offense of conviction did not include as an element the killing of another person, he was still responsible for the income lost by that victim because the offense of conviction involved a conspiracy (or scheme) that resulted in the victim's bodily injury and death.  *Id.*  The same conclusion follows here.

Although the Fifth Circuit has not weighed in on whether the MVRA authorizes an award of lost future income when the offense of conviction is neither a crime of violence generally nor a homicide specifically, the court has affirmed an award of necessary funeral expenses to victims when the offense of conviction was maintenance of a drug-involved premises, in violation of 21 U.S.C. § 856(a)(2).  *Mun*, 837 F. App'x at 296.  In *Mun*, the defendant was found to have operated "a hotel of horrors" wherein he permitted the distribution and use of illicit drugs at his property in exchange for a "drug tax" he assessed on occupants.  *Id.* at 295-96.  Mun "incentivized" occupants not to call 911 and took extensive measures to facilitate the hotel's ongoing operation without police intervention.  *Id.* at 296.  During the course of Mun's operation of this hotel, at least two victims died – one of an overdose and the other of either an overdose or a violent altercation with another "guest" of the hotel.  *Id.*  The district court found that Mun's actions were the direct and proximate cause of the victims' deaths and ordered restitution to the victims' estates under the MVRA for the amount of the victims' funeral expenses – even though Mun was never charged with or convicted of a homicide (or even a traditional crime of violence).  The Fifth Circuit affirmed, reasoning that "[a]gainst this backdrop, and pursuant to the MVRA, the district court

25

properly ordered restitution based on losses directly and proximately caused by Mun's offense of conviction." *Id.* Although the court in *Mun* did not address the issue of the victims' lost future income as a recoverable loss under the MVRA, the case stands for the proposition that a defendant can be responsible for losses stemming from a victim's death even when the defendant is not charged with or found guilty of the death itself.

Accordingly, pursuant to the plain language of the MVRA and consistent with relevant case law, the Court may properly order Schenck to pay restitution in the amount of S.A.'s lost future income and necessary funeral expenses because it has found that Schenck's conduct in furtherance of his scheme to defraud S.A. was the direct and proximate cause of S.A.'s death.

### d. Amount of restitution owed to S.A.

The Court's final task with respect to the restitution owed to S.A.'s estate is to quantify the harms resulting from Schenck's offense, that is, to fix the amount that Schenck is to pay. The Government argues that $1 million is an appropriate approximation of the future income S.A. lost as a result of Schenck's offense of conviction.[44] Arguing that "absolute specificity" in the amount of the award is unnecessary, the Government reaches this figure by employing the usual analysis of estimating S.A.'s annual income and multiplying it by the number of years S.A. would have worked had he not died. Thus, the Government projects that S.A. would have earned $40,000 each year for "at least another 25 years."[45] With its pre-restitution hearing memorandum, the Government offered evidence of S.A.'s income for the full year before his death and for the portion of the year in which he died.[46] At the restitution hearing, the Government presented evidence of S.A.'s earnings in the years prior to his death. Through the testimony of S.A.'s father, including

---

[44] R. Doc. 170 at 14.
[45] *Id.* S.A. was 40 years old at the time of his death and, says the Government, "likely had at least another 25 years in the workforce." *Id.* (citing data regarding retirement ages for men in the United States).
[46] R. Doc. 170-10 at 1-2.

a fairly thorough review of S.A.'s tax and earnings records,[47] the Government established that the $40,000 figure for S.A.'s estimated annual earnings was on the conservative side.[48]  Schenck objects to the Government's request for $1 million, arguing that, should the Court decide to order him to pay restitution for S.A.'s lost future income, the amount imposed must be adjusted to reflect the net present value of the future income and discounted for S.A.'s anticipated consumption rate.[49] To do otherwise, insists Schenck, would run contrary to the MVRA's mandate that "'every dollar must be supported by record evidence.'"[50]

When the proper restitution amount is in dispute, the Court must resolve the dispute "by the preponderance of the evidence."  18 U.S.C. § 3664(e).  The Government bears the burden of establishing the appropriate amount.  *Id.*  While the Court is satisfied that the Government has borne its burden of establishing S.A.'s income level at the time of his death and a reasonable projection of S.A.'s work-life expectancy, the Court also agrees with Schenck that deductions for "living expenses" (*i.e.*, consumption) and a present-value analysis of the future income are warranted.  *See, e.g.*, *United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006) (reversing restitution order under the MVRA where district court based the seller's losses on "gross, rather than net, lost profits" because that is "the appropriate measure in this commercial setting"); *Cienfuegos*, 462 F.3d at 1169 (reversing district court's refusal to award restitution for victim's lost future income due to complexity of the calculation, observing that "[w]hile calculation of future lost income must be based upon certain economic assumptions, the concepts and analysis involved are well-developed in federal law, and thus the district court is not without persuasive

---

[47] Specifically, the Court received into evidence testimony concerning S.A.'s federal tax returns for the years 2012-2015.

[48] The Government submits that the figure is "conservative" because it does not include "variations in earning and likely salary increases due to heightened seniority, cost of living, and inflation."  R. Doc. 170 at 14.

[49] R. Doc. 186 at 13-14.

[50] *Id.* at 14 (quoting *Sharma*, 703 F.3d at 323).

analogy for guidance," and remanding for calculation of an appropriate sum with consideration of factors such as a discount rate); *Serawop*, 505 F.3d at 1125 (affirming district court's order of restitution where the amount in lost future income was "'based upon certain economic assumptions'" but the court relied upon "well-recognized industry standards and norms" to project future income) (quoting *Cienfuegos*, 462 F.3d at 1169); *United States v. Arthur*, 750 F. App'x 540, 543 (9th Cir. 2018) (vacating district court's restitution award for lost future income and remanding for the district court to "consider whether a consumption offset is necessary concerning the [deceased victim]'s projected lost income"); *United States v. Williams*, 946 F. Supp. 2d 112, 119 (D.D.C. 2013) (holding that the government satisfied its burden of proving the amount of the deceased victim's lost future income when it "appropriately discounted the present value of the estimated future earnings" and excluded consumption expenses); *but see Razo-Leora*, 961 F.2d at 1146 (affirming the district court's award of lost future income based on the "relatively conservative" assumption that the victim would earn $5,000 per year for another 20 years); *Poole*, 2012 WL 4863789, at *3 (holding that "$200,000 is a reasonable estimate of the decedent's future lost wages" based on evidence of the victim's "salary and workload").

Here, the Court elects to employ "well-recognized industry standards and norms" for calculating lost future income by discounting the Government's lost-income figure (*viz.*, $1,000,000 = $40,000 x 25 years) to its present value and adjusting it for personal consumption. "Fifth Circuit precedent requires that this Court use the 'below-market-discount method' to account for the effect of inflation." *Rivera v. Kirby Corp.*, 2019 WL 4051854, at *7 (S.D. Tex. Aug. 28, 2019) (citing *Culver v. Slater Boat Co.*, 772 F.2d 114, 117-18 (5th Cir. 1983)); *see also Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 548-49 (1983) (describing the circumstances in which a court should employ a "below-market" discount rate in calculating the

present value of an award of future earnings and observing that "we do not believe a trial court adopting such an approach … should be reversed if it adopts a rate between one and three percent and explains its choice"); *Rhodes v. Guiberson Oil Tools*, 82 F.3d 615, 622-23 (5th Cir. 1996) (applying *Culver* to require use of a below-market discount rate on remand to the district court). The Court will use a below-market discount rate of 2%.[51]  Applying this rate over the 25 years of S.A.'s work-life expectancy, the Court calculates the net present value of S.A.'s lost future wages to be $780,938.30.  Next, the Court will use 60% as the appropriate factor to reflect S.A.'s personal consumption.[52]  Deducting 60% from the discounted lost-income figure, the Court calculates the remainder to be $312,375.30, and awards this amount in restitution.

---

[51] To arrive at this rate, the Court examined a number of sources.  First, it considered the current month's coupon equivalent rates for 1-year United States Treasury bills, approximately 4.5%, and subtracted from that figure the average annual percent change in the consumer price index (to account for inflation) over the last ten years, approximately 2.5%.  *See* U.S. Dep't of the Treasury, *Daily Treasury Bill Rates*, https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_bill_rates&field_tdr_date_value=2023  (last visited Apr. 18, 2023) (Treasury bill rates); Fed. Rsrv. Bank of Minneapolis, *Consumer Price Index, 1913-*, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913-  (last visited Apr. 18, 2023) (annual percent change in consumer price index).  Second, the 2% figure lies within the range approved by the Supreme Court in *Pfeifer* and approximates the below-market discount rates used by other courts in recent years.  *See, e.g., Taylor v. B&J Martin, Inc.,* 2020 WL 4923496, at *1-2 (E.D. La. Apr. 23, 2020) (applying a below-market discount rate of 1.45%); *Rivera,* 2019 WL 4051854, at *7 (applying a below-market interest rate in the range between .87% and 1.58%).  Third, the 2% figure is also in line with the Office of Management and Budget's forecasted "real discount rate" (that is, the market discount rate reduced to account for inflation) of 2% for a 20- to 30-year period.  *See* OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB CIRCULAR A-94, GUIDELINES AND DISCOUNT RATES FOR BENEFIT-COST ANALYSIS OF FEDERAL AGENCIES, APPENDIX C (revised Dec. 12, 2022), *appended to* OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB MEMORANDUM M-23-12, 2023 DISCOUNT RATES FOR OMB CIRCULAR NO. A-94 (Feb. 17, 2023).

[52] To arrive at this figure, the Court relies upon the Patton-Nelson Personal Consumption Tables 2016-17. *See* Michael R. Ruble, Robert T. Patton & David M. Nelson, *Patton-Nelson Personal Consumption Tables 2016-17*, 25 J. LEGAL ECON. 75 (2019).  As a percentage of average income before taxes, the total average annual expenditures for a single-person household (excluding pensions and social security, vehicle purchases, and household furnishings and equipment) was 75.8% of income for those in the $40,000 to $49,999 annual income bracket; 62.8% in the $50,000 to $59,999 bracket; and $49.5% in the $70,000 and above bracket.  *Id.* at 78.  Because S.A.'s income likely would have increased over the remaining 25 years of his work life, the Court finds 60% to be an appropriate rate of personal consumption, especially when considering that the figure is a rough average of the three percentages from the income brackets most relevant to S.A.'s lost future income.

As for funeral expenses, the Government has provided evidence that S.A.'s family incurred $12,885.84 in costs.[53]   Schenck does not contest this amount.   Accordingly, the Court sets the amount Schenck is ordered to pay for funeral expenses as $12,885.84.

### 3. The gross income or value of Berry's commercial sex acts

The Government argues that the Court should order Schenck to pay restitution to Berry in the amount reflecting the "[g]ross income or value" that Schenck received during his prostitution trafficking scheme, which underpins his conviction for violation of 18 U.S.C. § 1952, as a result of his confiscating from Berry the proceeds from the "commercial sex acts" she performed.[54] Schenck argues that such an award "is simply not authorized by the MVRA" because no authority exists to support the Government's restitution request for the value of such illegal acts.[55] Moreover, Schenck argues that, as a co-conspirator, Berry does not qualify as a victim under the MVRA.[56]

The Court agrees with the Government that, after a certain point in time, Berry was not a co-conspirator in Schenck's scheme to traffic her in furtherance of the prostitution enterprise. Based on the PSR and evidence received at Schenck's sentencing hearing, the Court found that, sometime after commencing the scheme together, Schenck used violence or threats of violence to force Berry into ongoing participation in his enterprise and sentenced him in accordance with that finding.[57]   However, the Court cannot award the restitution the Government requests for two reasons.

---

[53] R. Doc. 170-9 at 1.
[54] R. Doc. 170 at 14.
[55] R. Docs. 186 at 7-10; 193 at 2-3; 194 at 2-4.
[56] R. Docs. 186 at 9-10; 193 at 1-2.
[57] R. Docs. 140; 145 (and accompanying exhibits).

First, the Government cites to no authority to support the contention that the MVRA authorizes an award of restitution reflecting the value of proceeds a victim would have earned through the commission of illegal acts.   The Government's reliance on *United States v. Sukhtipyaroge*, 1 F.4th 603, 605 (8th Cir. 2021), is misplaced.   In *Sukhtipyaroge*, the court affirmed the district court's order of restitution under the MVRA for lost past and future wages, among other losses.  *Id.*   The defendant was convicted of visa fraud, wherein he "help[ed] a high school student enter the United States on a fraudulent visa" and thereafter "sexually and financially exploited" the victim.  *Id.*   The victim worked for months at the defendant's restaurant for "below-market wages" and was subjected to the defendant's "withholding large sums from his paycheck." *Id.* at 608.   The district court awarded restitution for the fair value of the wages he lost due to the defendant's conduct while working at the restaurant.   *Id.*   Nowhere in the restitution order, however, did the district court order the defendant to pay restitution based on the value of proceeds the victim obtained through illegal activities, such as drug dealing or trading in stolen goods.   To the contrary, the court directed the defendant to pay the victim the outstanding wages owed for his work in a restaurant at a below-market wage rate – in other words, wages for labor that can hardly be deemed an illegal act.   *Id.*; *see also United States v. Sukhtipyaroge*, 394 F. Supp. 3d 951, 960-63 (D. Minn. 2019) (detailing calculation of restitution award for lost wages).   The other cases cited by the Government fail for this reason as well.   *See, e.g.*, *United States v. Ojeikere*, 545 F.3d 220, 221-23 (2d Cir. 2008) (affirming restitution award under MVRA to victims for money they lost in defendant's wire fraud scheme because they did not commit the illegal act, even though they themselves had greedy or dishonest motives when parting with their money); *United States v. Sanga*, 967 F.2d 1332, 1335-36 (9th Cir. 1992) (affirming award of restitution under the Victim and Witness Protection Act for lost wages the victim should have earned as a maid had she not

been paid at a substandard wage rate, even though the victim was brought into the United States illegally); *United States v. Kendre*, 486 F. App'x 271, 276 (3d Cir. 2012) (affirming award of restitution for income the defendant stole from victims who had earned the income from "non-H-1B [visa] employers" in the course of the defendant's visa fraud scheme because their "participation did not drive [the defendant's illegal] conduct").  Had the Government's restitution request been for the value of income Berry could have earned in a lawful occupation had she not been forced to participate in Schenck's prostitution trafficking scheme, an order for such an amount could have been cognizable under the MVRA and would have had support in the authorities the Government cites.  But the Government put on no such proof and now persists in its unsupported position that the MVRA allows restitution reflecting the value of the proceeds Berry should have earned from her commercial sex acts.

The Second Circuit has aptly explained the rationale for rejecting the Government's position that the MVRA authorizes restitution for proceeds from an illegal activity:

> [A] would-be burglar who is robbed by a potential accomplice before either of them commits the planned crime may be entitled to restitution.  On the other hand, restitution would not be appropriate if one burglar were to rob another of the proceeds of a heist they have just committed.  *See, e.g., United States v. Martinez*, 978 F. Supp. 1442, 1453 (D.N.M.1997) ("It is intuitively obvious that Congress did not intend to have the federal judiciary take the lead in rewarding, through restitution orders, persons robbed of monies they had *obtained* by unlawful means, especially where as a matter of policy, federal courts generally would not award those monies were they sought in a civil action.  This is especially true when the person who would benefit has violated federal laws.").

*Ojeikere*, 545 F.3d at 223 (emphasis in original).  The Government seeks restitution in the amount of income Berry would have received through unlawful means – money given in exchange for commercial sex acts – had Schenck not stolen the proceeds for himself as part of his trafficking scheme.  But its cited authorities fail to support such a request, and the Court is aware of no cases

where a victim (like Berry, in this instance) was found to be entitled to a restitution award under the MVRA for the profits of the victim's own illegal acts.

The Government's reliance on *United States v. Williams*, 783 F. App'x 269 (4th Cir. 2019), for the proposition that illegal proceeds from prostitution activities are recoverable under the MVRA is unavailing.  There, the court affirmed the district court's restitution order reflecting the amount of lost wages a minor who was a trafficking victim would have earned for her services.  However, the court's authority for restitution in *Williams* derived from the Trafficking Victims Protection Act (the "TVPA"), not the MVRA.  *Id.* at 277.  The TVPA mandates restitution for "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act."  18 U.S.C. § 1593(a)(3)).  The MVRA contains no such provision, and the parties do not argue that the TVPA is applicable here.  Accordingly, *Williams* and the other cases in which restitution was ordered under the TVPA do not bear on the Court's authority to award restitution under the MVRA for the value of proceeds from commercial sex acts that the victim lost as a result of the defendant's offense of conviction.[58]

Second, the Court declines the Government's restitution request as it pertains to Berry because the amount requested – $54,000 – is speculative and fails to properly quantify the "actual harm" to Berry as a result of Schenck's offense of conviction.  *See Sharma*, 73 F.3d at 323 ("The MVRA limits restitution to the *actual loss* directly and proximately caused by the defendant's offense of conviction.") (emphasis added).  Indeed, "[a]n award of restitution greater than a victim's actual loss exceeds the MVRA's statutory maximum."  *Id.* at 322.  The Government bears

---

[58] Moreover, even the referenced provisions of the TVPA may be read to support only the same kind of award this Court previously said would be available under the MVRA – namely, the value of income lost by a victim as measured by what the victim would have earned in a lawful occupation – had the Government presented such evidence.

the burden of proving the victim's actual loss by a preponderance of the evidence.  Here, the Government submits that "[c]onservatively, ... Berry engaged in at least 360 commercial sex acts" between March 2014 and September 2017.[59]  This figure is based on Schenck's admission, in the factual basis, that Berry performed commercial sex acts "'on multiple days of nearly every week'" between those dates.[60]  Extrapolating from this admission, the Government derives the number 360 by multiplying two sex acts a week for three-and-a-half years.  The Government offers no other explanation or evidence for its rough estimate that two sex acts occurred each week during that time.  As for the fee charged, the Government estimates that Berry's services cost $150 per hour by referencing an advertisement Schenck prepared for her services.[61]  The Government calculates the $54,000 restitution award it requests for Berry by multiplying $150 by 360, the guesstimated number of sex acts.  This kind of conjecture is insufficient under the MVRA, where "every dollar must be supported by record evidence."  *Id.* at 323.  Based on the Government's showing, the Court cannot meaningfully fix Berry's "actual loss," which establishes the limit of the Court's authority to order restitution under the MVRA.  Therefore, even assuming Berry could be awarded restitution under the MVRA for the value of proceeds derived from illegal acts (her commercial sex acts), the Government has not satisfied its burden of demonstrating Berry's "actual loss" by a preponderance of the evidence.

### 4.  Schedule of payment

Pursuant to 18 U.S.C. § 3664(f)(2), "[u]pon determination of the amount of restitution owed to each victim, the court shall ... specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid."  This determination is to be made in

---

[59] R. Doc. 170 at 15-16.
[60] *Id.* at 15 (quoting R. Doc. 120 at 3).
[61] *Id.* at 16.

consideration of the defendant's financial circumstances.  *Id.* § 3664(f)(2)(A)-(C).  Additionally, Schenck is required to:

> notify the court and the Attorney General of any material change in [his] economic circumstances that might affect [his] ability to pay restitution.  The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim.  The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances.  Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

*Id.* § 3664(k).  The Court retains jurisdiction to adjust the schedule of Schenck's restitution payments as the interests of justice require.  *Id.*

Here, a review of the PSR indicates that Schenck has no assets and $43,701 in liabilities.[62] Schenck has two children but is under no legal duty to provide financial assistance to them.[63] Because he is in custody, he does not currently have monthly income or expenses.  Based on Schenck's financial condition, and pursuant to 18 U.S.C. § 3664(f)(3)(B), he is ordered to pay in restitution an amount equal to 50% of any wages he earns while incarcerated, on a monthly basis, should the Bureau of Prisons permit him to engage in compensable work.  Upon his release from prison, Schenck is ordered to pay an amount equal to 50% of his income on a monthly basis until the restitution obligation has been satisfied.  Each victim specified herein shall receive from each of Schenck's restitution payments an amount representing that victim's proportionate share of the total restitution award.

---

[62] R. Doc. 140 at 36.
[63] *Id.* at 33.

**IV.    CONCLUSION**

Accordingly, for the forgoing reasons, Schenck is ordered to pay restitution to the victims in the amounts fixed herein and pursuant to the terms established in the Court's forthcoming amended judgment.

New Orleans, Louisiana, this 20th day of April, 2023.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE